**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

**THE J. NOBLE GROUP, LLC**
101 Midden Way
Holly Springs, NC 27540

      **Plaintiff,**

v.

**REGINALD ALLEN**
21 Murray Hill Circle
Baltimore, MD 21212

**And**

**BROADCAST COMMERCIAL**
**CONSTRUCTION LLC d/b/a Broadcast**      Case No.: _____
**Commercial Construction and Development**

Serve on:
<u>Resident Agent</u>
Reginald Allen
21 Murray Hill Circle
Baltimore, MD 21212

**And**

**MICHAEL R. WEBER, ESQ.**
3667 Arbor Chase Drive
Palm Harbor, FL 34683

      **Defendants.**

## <u>COMPLAINT</u>

Plaintiff, by undersigned counsel, files this Complaint and sues the Defendants Reginald Allen, Broadcast Commercial Construction, LLC d/b/a Broadcast Commercial Construction and Development ("BCCD"), and Michael R. Weber, Esq. and claims damages, demands judgment, and states for cause as following:

## INTRODUCTION

This lawsuit arises from a fraud perpetrated by Defendant Reginald Allen and a licensed Florida attorney, Defendant Michael Weber, Esq., who represented to Plaintiff's managing member, Josh Brammer, that Defendant Allen had special access to vast quantities of medical gloves, which they offered to sell to Plaintiff provided Plaintiff deposited one million dollars into a Florida attorney's trust account pending completion of the sale. This fraud was predicated on the false perception that Defendant Weber, a licensed Florida attorney, would safeguard the escrow funds pending completion of the sale.

Instead of waiting for Defendant Allen to make available the medical gloves for inspection and sale as the escrow agent before releasing the funds, Defendant Weber instead transferred $895,000.00 – without the knowledge of or the permission of Plaintiff – to an account controlled by Defendant Allen within hours of receiving the money. This occurred before Plaintiff even had the opportunity to conduct due diligence and inspect the goods. Despite Mr. Brammer traveling from North Carolina to California for extended periods of time in 2021 waiting for the opportunity to inspect the medical gloves, this opportunity never materialized. Although Defendants repeatedly claimed to have the ability to sell hundreds of millions of boxes of medical gloves, Defendants have never produced a single box of gloves for sale to Plaintiff despite having one million dollars of Plaintiff's money. While Defendant Weber placed his personal residence on the market in May 2022 to purportedly begin to repay the stolen money and Defendant Allen has repeatedly made false promises of repaying the money, this lawsuit seeks to recover this money and compensatory damages from these Defendants based on their unlawful conduct.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the Plaintiff and the Defendants, and the amount in controversy exceeds $75,000.

2.      Venue is proper in this Court under 28 U.S.C. 1391(b) because Defendant Allen resides in this District.

## PARTIES

3.      Plaintiff is a limited liability company organized under the laws of North Carolina with its principal place of business in North Carolina. Plaintiff has one member, Josh Brammer, who is a citizen of the state of North Carolina.

4.      Defendant Reginald Allen is a citizen of Maryland.  He resides at 21 Murray Hill Circle in Baltimore, Maryland 21212. Upon information and belief, Defendant Allen is the Managing Member of Broadcast Commercial Construction, LLC.

5.      Defendant Broadcast Commercial Construction, LLC d/b/a Broadcast Commercial Construction and Development is a limited liability company organized under the laws of Maryland with its principal place of business in Maryland. Upon information and belief, Reginald Allen is the Managing Member of Defendant Broadcast Commercial Construction, LLC.

6.      Defendant Michael R. Weber, Esq. is a citizen of the state of Florida who resides at 3667 Arbor Chase Drive in Palm Harbor, Florida 34683. Defendant Weber is an attorney licensed in the State of Florida. His Florida bar number is: 985030.  Defendant Weber has an IOLTA account at JPMorgan Chase Bank, N.A., which he used to receive money from Plaintiff.

## BACKGROUND

7.      Plaintiff is a North Carolina based business that conducts business in the health care industry.

8.      Plaintiff was seeking to purchase a large quantity of medical gloves, and it was put into contact with Reginald Allen as a potential vendor to sell these items.

9.      Reginald Allen is a Baltimore based businessman who claimed to have business relationships with entities that provided him special access to purchase large quantities of medical gloves being imported into the Port of Long Beach in California. Mr. Allen claimed these special business relationships would allow Plaintiff to opportunity to purchase medical gloves that were "OTG" or on the ground in the United States so they were immediately available. Mr. Allen also claimed that his business connections would allow Plaintiff to circumvent the normal purchasing process and requirements, which were typically available only to large institutional purchasers or investors.

10.      On June 3, 2021, Defendant Weber sent a letter to Plaintiff swearing under the penalties of perjury that Defendant BCCD had 180 million boxes of medical gloves available for purchase:

> I am counsel to BCCD, a buyer and supplier of Personal Protection Equipment product.  I make this attestation and declaration as to the existence of certain product, specifically a lot consisting of up to One hundred eighty million (180,000,000) boxes of Cranberry Evolve Gloves, Three Hundred (300) per box (the "Product") which my client is setting aside from a 2 billion box lot that has been proof up.

> As has been stated previously, the availability of this product and its pricing ($22.75) is contingent on the end-buyer permitting the Product be allocated to Wellstand. However, my client has received approval to sell these goods with the contingency that a deposit will be made on Thursday, June 4, 2021.

> I have knowledge of the matters state herein based upon a June 2, 2021, letter of attestation from the attorney who is verified through 3M the seller and the title holder of the Product.  He makes his statements under penalty of perjury and

4

declares the content to be "true and accurate" and that "false or misleading statements will subject the attorney to reprimand or disbarment."

1. The Product is part of a 2+ billion box lot. The attorney confirmed that the titleholder is the legal title holder and not an allocation holder; that the product is OTG in the USA; and that the Product is SGS Ready (confirmed on June 1, 2021) and "ready to go."

2. BCCD will verify the SGS and notify Buyer; Buyer will given the opportunity to inspect product in conjunction with viewing redacted SGS.

3. Buyer will fully fund an attorney escrow account after the SPA and escrow agreements are executed.

4. Money will be transferred for payment from escrow and closed as directed in the SPA and written authorization to release funds from the escrow at which time title will be transferred.

PURSUANT TO FLORIDA LAW, UNDER PENALTY OF PERJURY, I DECLARE THE FOREGOING IS TRUE AND CORRECT. This letter is only intended for the addressee and for the use of this transaction only.

11.    It is believed and alleged that Defendants Weber and Allen's representations that BCCD had access to one hundred and eighty million boxes of medical gloves was a false representation.  It is believed and alleged that Defendants Weber and Allen made these false representations knowing they were false and/or with a reckless disregard for the truth and made for the purpose of inducing Plaintiff to wire money to Defendant Weber's attorney trust account.

12.    On June 6, 2021, Attorney Michael Weber sent Plaintiff a letter on his firm letterhead for Plaintiff and the broker to sign that would result in Plaintiff depositing $1,000,000.00 into an attorney escrow account pending inspection of the goods for potential purchase:

My client, Broadcast Commercial Construction & Development ("BCCD"), is prepared to sell your company, The J. Noble Group, LLC, and its end-buyers, up to 200 million boxes of Cranberry Evolve gloves (300ct) ("Transaction"). To commence Transaction, a $1 million earnest money deposit ("Earnest Money") is required to show capability to transact, and to provide Josh Brammer access to

various documentation including but not limited to SGS Reports, customs documents, Bills of Lading, and to allow Mr. Brammer physical inspection ("Due Diligence"). Earnest Money will be deposited immediately into IOTA escrow account of Michael R. Weber, Attorney at Law.

If Due Diligence is not provided by Thursday, June 10th, 2021, then Earnest Money will be refunded to The J. Noble Group LLC via forthcoming wire instructions within three (3) business days. If Transaction is not completed by June 17, 2021, the Earnest Money will be refunded to The J. Noble Group LLC via forthcoming wire instructions within three (3) business days.

(Ex. 1, 6/6/21 Contract).  Defendant Weber, Defendant Allen, and Plaintiff signed this agreement. (Ex. 1, 6/6/21 Contract).  A true and accurate copy of this contract is attached as **Exhibit 1**.

13.    Defendant Weber holds a license to practice law in Florida and operates an attorney trust account at JPMorgan Chase Bank, N.A.  Defendant Weber's involvement in this transaction was material to Plaintiffs decision to transact business with Allen and his company because Plaintiff trusted that a licensed Florida attorney would safeguard these funds in his attorney trust account pending compliance with the party's contractual obligations.

14.    To effectuate this agreement, the next day, June 7, 2021, Plaintiff wired $1,000,000.00 into an attorney trust account for Defendant Weber at JPMorgan Chase Bank, N.A. The account was titled as "Michael R. Weber Attorney at Law IOTA Trust Account." (Ex. 2, Bank Statement for Michael Weber).

15.    It was the understanding, expectation, agreement, and requirements of the Parties that the $1,000,000.00 in funds provided by the buyer would remain in Attorney Weber's escrow account pending delivery of the medical gloves.

16.    Plaintiff never agreed to or consented to Attorney Weber releasing these funds to Defendant Allen or Broadcast Commercial Construction, LLC.

17.     Unbeknownst to Plaintiff, that same day, in violation of the contract with Plaintiff, Defendant Weber transferred $895,000.00 from his attorney escrow account to Defendant Allen by wiring this money to an account for "Broadcast Commercial Construction Baltimore MD 21212." (Ex. 2, Bank Statement for Michael Weber).

18.     Without telling Plaintiff, on June 7, 2021, Defendant Weber immediately transferred $35,000.00 to himself.  Even though he had not completed any legal work for Plaintiff, he took the funds and transferred these escrowed funds from his trust account bank to a personal account. (Ex. 2, Bank Statement for Michael Weber).

19.     It is believed and alleged that the remaining $70,000.00 is in the custody and control of Defendant Weber either in a personal bank account or in his attorney trust bank account.

20.     After wiring the funds to Defendant Weber to be held in escrow, Plaintiff repeatedly attempted to complete the due diligence process for the sale by physically inspecting the medical gloves at a warehouse in California. Mr. Brammer left his home in North Carolina and spent lengthy periods in California solely for the purpose of waiting for the opportunity to inspect goods, which never materialized.

21.     Defendant Allen never made the 200 million boxes of Cranberry Evolve gloves available for inspection.

22.     On June 20, 2021, Defendant Allen and Broadcast Commercial Construction, LLC breached the June 6, 2021 contract because it failed to return $1,000,000.00 to Plaintiff.

23.     On June 24, 2021, Broadcast Commercial Construction, LLC returned $400,000.00, but remained in breach of the June 6, 2021 contract by failing to return to Plaintiff all of the $1,000,000.00.

24.     On June 28, 2021, Defendant Weber sent a letter to a customer of Plaintiff, signed

under the penalties of perjury, attesting to the fact that Defendant Allen was able to sell

approximately 240 million boxes of medical gloves:

> To whom it may concern:
>
> With this letter, I attest that my client, Reginald Allen, president of BCCD, has
> entered 2 Chino, California, warehouses and personally, physically inspected
> within the last 2 weeks the product which is warehoused on a six tier racking
> system (approximately 240 million boxes) and that a verifiable SGS Report (for
> up to 5 billion boxes) for the master lot which references these warehouses is in
> hand. My client is ready, willing and able to transact.
>
> PURSUANT TO FLORIDA LAW, UNDER PENALTY OF PERJURY, I
> DECLARE THE FOREGOING IS TRUE AND CORRECT.

(Ex. 3, 6/28/21 Attorney Attestation).

25.     This letter was false and contained intentionally false misrepresentations, which

was made by Defendant Weber, as an agent for Defendant Allen and BCCD, in order to convince

Plaintiff to refrain from demanding the return of the $600,000.00 that remained in Defendants'

custody and control.

26.     These false representations included Defendant Weber's claim that (1) Defendant

Allen had personally physically inspected 240 million gloves that were available for sale to

Plaintiff, (2) he had a SGS report for up to 5 billion boxes, and (3) that his client was "read,

willing and able to transact."

27.     On July 3, 2021, Defendant Weber sent another letter described as an "Attorney

Attestation," signed under the penalties of perjury, again attesting to the fact that Defendant

Allen was able to sell approximately 240 million boxes of medical gloves:

> To whom it may concern:
>
> I represent BCCD which has a secured a large lot of Cranberry Evolve nitrile
> gloves that is being broken up to supply various purchasers from JNG.

I attest that my client, BCCD, has entered two Chino, California, warehouses and personally, physically inspected within the last two weeks the product which is warehoused on a six tier racking system (approximately 240 million boxes) and that a verifiable SGS Report for the master lot which references these warehouses is in hand. My client is ready, willing and able to transact.

As you likely know, since the pandemic, purchases of gloves have turned from a transaction in which hospitals could purchase on 30 to 45 day terms into a complex commodity transaction requiring proofings of funds showing liquid cash into the billions of dollars, certifications of verifiable SGS Reports that purported sellers eventually cannot provide, movement of billions of dollars to and through attorney escrow accounts, actual on-the-ground physical inspections of millions to billions of boxes of gloves, etc.

BCCD anticipated in this past week to have had the SGS Report in a state able to be shared with the downstream buyers. Given the complexity of these commodity transactions, BCCD anticipates that day to be early this upcoming week. The delay occurred with third parties providing key documents in time.

**I do attest, under penalty of perjury, that all key, material prerequisites for the success of this transaction have been met and that this transaction is imminent.**

PURSUANT TO FLORIDA LAW, UNDER PENALTY OF PERJURY, I DECLARE THE FOREGOING IS TRUE AND CORRECT.

(Ex. 4, 7/3/21 Attorney Attestation).

28.      Defendants Weber and Allen knew the representations in the July 3, 2021 letter, including the statements in the preceding paragraph, were false and/or the false representations were made with a reckless disregard for the truth.  It is further alleged that these statements were made for purpose of delaying Plaintiff from seeking the return of their money and obscure the fact that Defendant Weber had already transferred most of Plaintiff's money from his attorney trust account to Defendant Allen.

29.      On July 14, 2021, Defendant Weber sent one of Plaintiff's customers a letter stating that Plaintiff "is purchasing 500 million boxes of Product":

Dear Ms. Kang:

I am legal counsel to BCCD.  Your company is a customer to the J. Noble Group
LLC ("JNG") whose senior executive is Joshua Brammer.  JNG is purchasing up
to 500 million boxes of Product from my client and supplying your company its
allocation of the Product.

Unfortunately, the purchase of PPE is now a commodity transaction usually
requiring a "proof up" stage in which the buyer must demonstrate that the full
purchase price for the commodity is available in a bank account it controls.  Few
true users of PPE have the ability to participate at this stage since many SOPs
now require viewing of key documents like the SGS Report before funds can be
released for the purchase.  BCCD has several large buyers but is assisting JNG's
buyers to provide gloves to their end buyers, namely hospitals, physician offices,
and first responders.

To facilitate this, BCCD had setup for the purchase of a large lot of Cranberry
gloves that allowed JNG and its buyers to avoid the "proof up" stage by
leveraging the "proof up" of a large buyer to trigger the availability of an SGS
Report.  JNG's customers could then view and validate with me, as planned on
July 12, 2021, and then transfer funds to escrow for physical inspection.
However, over the weekend, BCCD's large buyer increased its order, which
required the reallocation of the master lot by the titleholder and movement and
verification by the titleholder of additional funding.

We apologize that this time delay is affecting you and your customers.  As we
organize the funding, I attest to the following:

- That I am confident that JNG Customers will be receiving their ordered
  Product
- That BCCD's large buyer has been purchasing in the PPE space
  throughout the pandemic and has the required funds.
- That BCCD has access to Cranberry gloves from the actual titleholder.
- That I am working directly with the titleholder's attorney.
- That I had personally viewed and verified the SGS Report with Seller's
  attorney for the previous lot from which JNG would received its 500M
  allotment.
- That the larger, master lot (OTG USA) from the same titleholder includes
  the allocation for JNG's 500M allotment.

As to timing for the next Zoom call to review and validate SGS, I must adjust the
dates suggested on Monday's call.  After speaking with the attorneys, funds will
be in place for the ATV verification "proof up" this Friday.  This permits a Zoom
review of the SGS report with your attorney this Monday, that is July 19 at 1pm
EST.

10

PURSUANT TO FLORIDA LAW, UNDER PENALTY OF PERJURY, I DECLARE THE FOREGOING IS TRUE AND CORRECT.

30.     On August 20, 2021, Defendant Weber sent a letter to a company that sought to purchase medical gloves from Plaintiff to assure Plaintiff and its customer that Plaintiff "is purchasing over 500 million boxes of Cranberry gloves ("Product") from my client and supplying your company with its allocation of the Product":

Dear Mr. Potenza:

I am legal counsel to BCCD.  Your company is a customer of The J. Noble Group LLC ("JNG") whose president is Joshua Brammer.  JNG is purchasing over 500 million boxes of Cranberry gloves ("Product") from my client and supplying your company with its allocation of the Product.

BCCD has completed its execution of agreements and funding necessary for the purchase multiple lots of Product that includes an allocation of JNG and its customers.  Funding for these transactions is currently in a Chase and other "Top 5 U.S. bank" account.  My client with its JV funding partner will be depositing between 2% and 10% of the purchase price of these lots in escrow accounts on Monday, August 23, 2021, or the following Tuesday.  **It is this important aspect of the transactions that unburdens JNG's customers from needing to "proof up".**

Within 1 to 8 business hours of such deposits, SGS reports will be delivered by the title holder and validated. Within 4 business hours of SGS being accepted and wires for sufficient funds being confirmed executed according to instructions in the various sales and purchase agreements ("SPAs"), BCCD will assign warehouse locations to JNG's buyers and physical inspections will be scheduled with the warehouse management.

My client has one additional lot that may pass key milestones faster than the above lots.  This transaction may produce the SGS Report on Sunday or early Monday for validation.  Within 4 business hours of SGS being accepted and wires for sufficient funds being confirmed executed according to instructions in the various sales and purchase agreements ("SPAs"), BCCD will assign warehouse locations to JNG's buyers and physical inspections will be scheduled with the warehouse management.

PURSUANT TO FLORIDA LAW, UNDER PENALTY OF PERJURY, I DECLARE THE FOREGOING IS TRUE AND CORRECT.

31.    On September 25, 2021, Defendant Allen again claimed to have approximately one billion boxes of medical gloves on the ground in the United States available for sale to Plaintiff.  Plaintiff sought proof of the existence of the gloves such as a video of Defendant Allen in the warehouse with the medical gloves he claimed to possess. In response, Defendant Allen falsely stated "[t]here was no video allowed." In reality, there were no gloves available for sale in Defendant Allen's custody or control.  Additionally, Defendant Allen made this false representation, knowing it was false, for the purpose of inducing Plaintiff to deposit an additional $400,000.00 into Defendant Weber's attorney trust account.

32.    With Defendants still retaining $600,000.00 of Plaintiff's money and Defendant Allen claiming that he could still provide a large quantity of Cranberry Evolve gloves, Defendant Allen and Plaintiff entered into an "Interim Agreement" dated September 29, 2021 that provided Plaintiff would wire $400,000 back to Attorney Weber's attorney escrow account in exchange for Plaintiff having the opportunity to purchase "up to One Billion (1,000,000,000) boxes" of Cranberry Evolve gloves. It provided as follows:

### INTERIM AGREEMENT

On this 29th day of September 2021, Broadcast Commercial Construction & Development ("BCCD"), and The J. Noble Group, LLC ("JNoble") agree as set forth in this Interim Agreement.

### Background & Understanding

• BCCD plans to sell to JNoble and its end-buyers, up to One Billion (1,000,000,000) boxes of Cranberry Evolve gloves (300ct) (the "Transaction").

• To commence the Transaction, a $1 million earnest money deposit ("Earnest Money") is required to show capability to transact, and to provide Mr. Brammer access to various documentation including but not limited to SGS Reports, customs documents, Bills of Lading, and to allow Mr. Brammer physical inspection ("Due Diligence").

• To date, $600,000 of the $1 million in Earnest Money has been paid. This Interim Agreement governs JNoble's payment of the remaining $400,000 as well as other terms prior to execution of a sales & purchase agreement ("SPA") and escrow agreement ("EA").

## Agreement

For consideration mutually agreeable to both parties, the parties agree as follows:

1. JNoble will wire the remaining $400,000 to the Chase escrow IOTA account of Michael R. Weber, Attorney at Law, said banking coordinates to be provided separately.

2. If the total $400,000 is received in the escrow account by Tuesday, October 5, 2021, JNoble will be allocated 1 billion boxes to sell. If the amount deposits in the account after said date, 500 million or more boxes will be available.

3. Within four (4) hours of signing the SPA and Escrow Agreement between BCCD and JNoble, BCCD will provide verifiable SGS to JNoble.

4. JNoble understands the need for BCCD to minimize and thus limit the number of log-ins to the SGS Portal. BCCD is working to determine how to provide JNoble's customers comfort that SGS has been validated, including, but not limited to, Buyers meeting in person with a BCCD SGS verification team.

5. Within 8 banking hours of the end of the SGS verification period, JNoble and each of its buyers must show proof that wires totaling the full amount have been sent to the designated escrow accounts and the amounts must have settled in said accounts within forty-eight (48) hours.

6. If the transaction is successful, the Earnest Money will be credited against the final purchase price. If the transaction has not closed by October 29, 2021, the Earnest Money will be returned to JNoble by October 29th, 2021, within three (3) business days to an account selected by JNoble.

(Ex. 5, Interim Agreement). A true and accurate copy of this contract is attached as **Exhibit 5**.

33.     To comply with the terms of the Interim Agreement, between September 30, 2021 and October 6, 2021, Plaintiff transferred an additional $400,000.00 to Defendant Weber's attorney trust account so Defendants again had $1,000,000.00 of Plaintiff's money in their custody and control.

34.     On September 30, 2021, Defendant Weber emailed Mr. Brammer and copied Mr. Allen confirming that "[t]his email confirms receipt of $100,000 in my firm's escrow account today as contemplated in the Interim Agreement executed yesterday between The J Noble Group and BCCD."

35.     On October 4, 2021, Attorney Weber emailed Mr. Brammer and copied Mr. Allen confirming that he received "an additional US$150,000 today in my escrow account":

> I confirm with this email that I received an additional US$150,000 today in my escrow account. With the previous $100,000 received plus this $150,000, please advise as to the timing of the remainder of the $400,000, namely $150,000.
>
> Thank you and I look forward to completing this transaction with you and your team.

36.     On October 5, 2021, Attorney Weber emailed Mr. Brammer and copied Mr. Allen confirming that he received "an additional US$75,000 today in my escrow account."  He explained: "With the previous $100,000 plus $150,000 plus this $75,000, please advise as to the timing of the remainder of the $400,000, namely $75,000."

37.     On October 6, 2021, Attorney Weber emailed Mr. Brammer and copied Mr. Allen confirming he "received an additional US$75,000 today in my escrow account."

> "I confirm with this email that I received an additional US$75,000 today in my escrow account. **With this deposit, the full deposit of $400,000 has been received**."

(Emphasis added).

38.     Defendants breached the September 29, 2021 "Interim Agreement" because they failed to make any gloves available for inspection or purchase, and they failed to return one million dollars to Plaintiff by October 29, 2021.

39.     On November 18, 2021, Defendant Weber sent Plaintiff another "Letter of

Attestation as to Product" signed under the penalties of perjury falsely attesting to the availability

of 100 million boxes of medical gloves:

> Dear Mr. Brammer:
>
> I am counsel to BCCD, a reseller of Personal Protection Equipment product. I
> make this attestation and declaration as to the existence of certain product,
> specifically a lot consisting of at least 25 million (25,000,000) boxes and up to
> 100 million (100,000,000) boxes of Cranberry Evolve Gloves, three hundred
> (300) per box (the "Product"), at $28.00/box inclusive of commission.
>
> I hold in my possession a letter of attestation from the Seller/Titleholder's
> attorney dated November 6, 2021, in which the attorney affirms under penalty of
> perjury:
>
>> a.  That his client is "Ready, Willing and Able to sell at least 25 million
>>     boxes of Cranberry Evolve nitrile gloves (300 count)".
>> b.  That "the Products are 100% on the ground and have cleared customs and
>>     [are] ready for sale. The Products have clean title with SGS Certification
>>     Report and Bill of Lading ("BOL") in possession of the Seller
>>     Titleholder. The goods are available for immediate transfer upon
>>     completion of the appropriate transaction documents and inspection";
>> c.  That the following documents will be provided buyer: SGS, BOL,
>>     shipping manifests, and warehouse receipts; and
>> d.  That the attorney has personally verified the SGS Reports.
>
> I attest that my client has personally viewed and verified the SGS Reports
> corresponding to this Product while he visited the offices of the Titleholder; I
> further attest that I personally viewed on a Zoom call one of the SGS Reports and
> validated 2 lots thereto. Further, my client has inspected said Product in 3
> warehouses in the California area within the last 3 weeks.

(Ex. 6, 11/18/21 Letter of Attestation).

40.     The representations in this November 18, 2021 "Letter of Attestation as to

Product" were false, and Defendants Weber and Allen knew these representations were false at

the time that Defendant Weber signed this document, and/or Defendant Weber made these

representations with a reckless disregard for the truth.

41.     Defendant Weber signed the "Letter of Attestation as to Product" as an agent for Defendants Allen and BCCD and made these false representations within the scope of his agency relationship with Defendants Allen and BCCD.

42.     In January 2022, Plaintiff discovered that Defendant Weber, instead of holding Plaintiff's money in escrow, had transferred $895,000.00 to a bank account controlled by Defendant Allen and transferred some of the money to a personal bank account that Defendant Weber controlled.

43.     On January 17, 2022, Defendant Allen signed a "Follow-on Agreement as to PPE Funds" agreeing to wire Plaintiff $1,000,000.00 by January 21, 2022 and agreeing to a 2% daily late fee if the funds are not returned by January 21, 2022.  It provides as follows:

### Follow-on Agreement as to PPE Funds

As of the 17th day of January 2022, Broadcast Commercial Construction & Development LLC ("BCCD") and The J Noble Group LLC ("JNG") agree to be governed by the terms of this Follow-on Agreement.

### Background & Understanding

• BCCD currently holds $1 million of JNG funds designated for the acquisition of PPE ("PPE Funds");
• As the PPE transaction has not yet transpired, BCCD desires to return the PPE Funds and JNG desires the return of the PPE Funds;
• BCCD desires to provide JNG an incentive to allow the repayment of the funds on January 21, 2022.

NOW, THEREFORE, in consideration of the premises and mutual covenants set forth in this Agreement, and consideration for which both Parties recognize its receipt and sufficiency, the Parties, intending to be legally bound by this Agreement and to comply with its terms, agree as follows:

### Agreement

1. BCCD will return the PPE Funds, along with the incentive in subsection b, to the account designated as follows

a. Wire the $1 million in PPE Funds by Friday, January 21, 2022 and

16

b. Wire an additional $1 million once the PPE transaction closes, payable within 1 business day of the PPE transaction closing.

2. If the funds are not deposited into the designated account by Friday, January 21st at 4pm then a 2% daily late fee will be added until the funds are deposited.

3. Amendments**.** No amendment, alteration, modification or variation of this Agreement shall be valid or binding unless set forth in a further written agreement executed by both of the Parties.

(Ex. 7, Follow on Agreement). A true and accurate copy of this contract is attached as **Exhibit 7**.

44.     Defendants breached this agreement by failing to return the $1,000,000.00 by January 21, 2022.

45.      It is believed and alleged that Mr. Allen's claims to be able to sell hundreds of millions of boxes of medical gloves to Plaintiff were false representations, which were made to defraud Plaintiff. Plaintiff believe and alleges these representations by Defendants Allen and Weber are false for several reasons.  First, despite repeatedly claiming to have vast quantities of medical gloves, Defendant Allen and Weber have never produced even a single box for sale to Plaintiff. Second, Defendant Allen and Weber have never produced to Plaintiff any verification documents to substantiate there claims such as SGS reports, bills of lading or other commercial acceptable documents to establish the existence of these products and Allen's custody, ownership, or right to sell these products. Instead, Defendant Allen refused to produce these documents because he claimed disclosing these documents would enable Plaintiff to somehow circumvent Allen's role as a purported intermediary in the transaction even though Allen and Weber had one million dollars of Plaintiff's money in their custody and control. Third, Defendant Allen never made available for inspection to Mr. Brammer or Plaintiff's customers any of the lots of medical gloves it claimed to have for sale. There is a proliferation of fake photos of goods and fake goods and a video inspection establishing a date and known person

17

physical present with the goods is an easy to way to establish the existence of goods for sale, but this easy verification opportunity never occurred despite Mr. Brammer's lengthy presence in California in 2021 waiting for this exact opportunity. Fourth, Defendants Allen and Weber never disclosed the name of the title holder who purportedly owned the lots of medical gloves that Defendant Allen claimed to have the ability to sell. Defendant Allen he claimed he would "never give up seller information," which was nothing more than effort to conceal this fraud.

46.     On March 4, 2022, Plaintiff through counsel demanded the return of the funds unlawfully withheld by Defendants.

47.     Defendants failed to return the stolen money.

48.     Defendant Allen has repeatedly falsely claimed that he was returning Plaintiff's money.  For example, on March 15, 2022, Defendant Weber emailed Mr. Brammer and others stating that Defendant Allen "just told me that from the funds BCCD will receive today (possibly tomorrow with slippage), $600,000 would be wired to the JNG account today (if available in time) or tomorrow, and the remaining $400,000 by Friday. Further, BCCD will pay an additional $4 million when BCCD closes the first of its glove transactions that is expected this week or early next week."

49.     Defendants did not wire this money to Plaintiff.

50.     On March 23, 2022, Defendant Allen emailed Mr. Brammer stating "[y]ou are getting One Million Dollars . . . this week."

51.     Defendants did not wire this money to Plaintiff.

52.     On May 13, 2022, Defendant Weber sent an email to Mr. Brammer, copying Defendant Allen, stating that "Reggie Allen states that he takes full responsibility for the $1 million."

53.    On May 19, 2022, purportedly in an attempt to raise money to repay the stolen money, Defendant Weber advised Mr. Brammer that Defendant Weber's home was "live on MLS" – the Multiple Listing Service – that lists real property for sale.  Defendant Weber provided the following link that reflects a residential property for sale with the address 3667 Arbor Chase Drive, Palm Harbor, Florida 34683: https://www.realtor.com/realestateandhomes-detail/M5773003261.

54.    Plaintiffs file this lawsuit to recover $1,000,000.00, the 2% daily late fee, compensatory damages, and lost profits for Defendants' unlawful conduct.

**Count I**
**Breach of Contract**
**(Against Broadcast Commercial Construction, LLC)**

55.    Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

56.    Plaintiff and Defendant entered into an agreement whereby Plaintiffs would transfer $1,000,000.00 to be held in trust in Defendant Weber's attorney trust account, Defendant Allen would produce a substantial quantity of medical gloves for sale, and Defendant Weber would hold the funds in escrow pending Defendants Allen and BCCD providing these goods for purchase.

57.    Defendant Broadcast Commercial Construction, LLC breached the June 6, 2021 agreement when it failed to refund $1,000,000.00 by June 20, 2021, and it failed to provide any medical gloves for sale.

58.    Defendant Broadcast Commercial Construction, LLC breached the September 29, 2021 Interim Agreement when it failed to refund $1,000,000.00 by October 29, 2021, and it failed to provide any medical gloves for sale.

59.     Defendant Broadcast Commercial Construction, LLC breached the January 17, 2022 "Follow-on Agreement as to PPE Funds" when it failed to refund $1,000,000.00 by January 21, 2022, it failed to pay a 2% daily late fee, and it failed to provide any medical gloves for sale.

60.     Plaintiff suffered damages as a result of BCCD's breach of contract, including the loss and deprivation of $1,000,000.00, late fees, consequential damages, the failure to pay the 2% daily late fee, and lost profits.

WHEREFORE, Plaintiff requests that the Court enter a judgment against Defendant as follows: (A) Awarding Plaintiff monetary damages against Defendants in the amount of $1,000,000.00 plus consequential damages and lost profits in an amount to be determined at trial but no less than $50,000.000.00; (B) Awarding Plaintiff a 2% daily late fee per the January 17, 2022 "Follow-on Agreement as to PPE Funds" which is presently due and owing in the amount of $21,386,963.96; (C) Awarding Plaintiffs their costs and expenses in this litigation; and (D) Awarding such other relief as the Court deems just and proper.

## COUNT II
### Negligence
### (Against Defendant Weber)

61.     Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

62.     Defendant Weber owed a duty of care to Plaintiff because Defendant Weber agreed to act as an escrow agent for the purchase of medical gloves being sold by Defendants Allen and BCCD when Defendant Weber agreed to accept money into his attorney trust account as an escrow agent pending completion of the sale.

20

63.   Defendant Weber breached this duty of care when he received $1,000,000.00 into his attorney trust account on June 7, 2021 from Plaintiff and the same day, before the sale was completed, transferred $895,000.00 to a bank account controlled by Defendant Allen.

64.   Defendant Weber again breached this duty of care when he received an additional $400,000.00 in September and October 2021 for the purchase of medical gloves and, it is believed and alleged, he transferred these funds to an account controlled by Defendant Allen.

65.   Defendant Weber further breached this duty of care when Plaintiff demanded the return of this $1,000,000.00 but Defendant Weber failed to return these funds to Plaintiff.

66.   Plaintiff suffered damages as a result of Defendant Weber's negligence, including but not limited to, the loss and deprivation of $1,000,000.00, consequential damages, and lost profits.

WHEREFORE, Plaintiff requests that the Court enter a judgment against Defendant Weber as follows: (A) Awarding Plaintiff compensatory damages against Defendant Weber in the amount of $1,000,000.00 plus consequential damages and lost profits in an amount to be determined at trial but no less than $50,000.000.00; (B) Awarding Plaintiffs their costs and expenses in this litigation; and (C) Awarding such other relief as the Court deems just and proper.

### COUNT III
### Conversion
### (Against Defendant Weber)

67.   Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

68.   Defendant Weber, as an escrow agent for a potential sale of goods between Plaintiff and BCCD, knew that the money deposited into Defendant Weber's trust account was

Plaintiff's money that was being held in escrow pending completion of a potential sale of medical gloves.

69.    Defendant Weber knowingly and intentionally converted Plaintiff's money when, on the same day that he received this money, he transferred $895,000.00 out of his attorney trust account to an account controlled by Defendant Allen and it is believed that Defendant Weber kept approximately $105,000.00 for himself.

70.    Defendant Weber intended to exercise dominion and control over this money without permission or justification and inconsistent with Plaintiff's rights to this money.

71.    Defendant Weber further converted this money when he kept some of Plaintiff's money as compensation for legal fees and transferred funds to a personal bank account even though he performed no legal services for Plaintiff and Plaintiff did not authorize him to take this money.

72.    The taking, refusal to return, and conversion of Plaintiff's property by Defendant Weber was done willfully and maliciously and with a reckless disregard for the rights of the Plaintiff.

73.    Plaintiff did not give permission to Defendant Weber to take the property or transfer the property out of his attorney trust account. In fact, Defendant Weber did not notify Plaintiff that he transferred the money out of his trust account until January 2022 when Plaintiff demanded the return of its money.

74.    Plaintiff has suffered damages as a result of Defendant Weber's conduct, which includes the $1,000,000.00, part of which Defendant Weber kept for himself and part of which he gave to Defendant Allen by transferring to a bank account controlled by Defendant Allen. Plaintiff also suffered consequential damages and lost profits as a result of this tort.

WHEREFORE, Plaintiff requests that the Court enter a judgment against Defendant Weber as follows: (A) Awarding Plaintiff compensatory damages against Defendant Weber in the amount of $1,000,000.00 plus consequential damages and lost profits in an amount to be determined at trial but no less than $50,000.000.00; (B) Awarding punitive damages in an amount to be determined at trial; (C) Awarding Plaintiffs their costs and expenses in this litigation; and (D) Awarding such other relief as the Court deems just and proper.

## COUNT IV
### Conversion
### (Against Defendant Allen and BCCD)

75.    Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

76.    Defendant Allen, individually and on behalf of BCCD, knew that Plaintiff deposited $1,000,000.00 into Defendant Weber's attorney trust account to be held in escrow pending completion of a potential sale of medical gloves, which he agreed to produce and sell.

77.    Defendant Allen, individually and on behalf of BCCD, requested that Defendant Weber transfer $895,000.00 of this one million dollars from his attorney trust account to an account controlled by Defendant Allen and in the name of "Broadcast Commercial Construction."

78.    Defendant Allen and BCCD intended to take Plaintiff's money and use it for their own purposes. Based on Defendant Allen's request or instruction, Defendant Weber transferred this money on or about June 7, 2021 to an account controlled by Defendant Allen.

79.    Upon information and belief, Defendant Allen spent and/or used this money for his business activities or personal use. This use and/or spending occurred in total disregard and in violation of Plaintiff's rights to this money.

80.    Defendant Allen and BCCD's actions were undertaken knowingly, intentionally, with ill-will and actual malice.

81.    When Plaintiff demanded the return of this money, Defendant Allen told Mr. Brammer that the money was "tied up in other projects" to justify his refusal and inability to immediately return this money.

82.    Plaintiff has suffered damages as a result of Defendants' conduct, which includes the $1,000,000.00, and consequential damages and lost profits.

WHEREFORE, Plaintiff requests that the Court enter a judgment, individually and jointly and severally, against Defendants Allen and BCCD as follows: (A) Awarding Plaintiff compensatory damages against Defendants in the amount of $1,000,000.00 plus consequential damages and lost profits in an amount to be determined at trial but no less than $50,000.000.00; (B) Awarding punitive damages in an amount to be determined at trial; (C) Awarding Plaintiff its costs and expenses in this litigation; and (D) Awarding such other relief as the Court deems just and proper.

## COUNT V
### Intentional Misrepresentation
### (Against All Defendants)

83.    Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

84.    Defendant Weber, individually and on behalf of Defendants Allen and BCCD, made false representations of material fact when he issued a letter dated June 3, 2021, sworn under the penalties of perjury, which asserted that BCCD had access to "up to One hundred eighty million (180,000,000) boxes of Cranberry Evolve Gloves, three hundred (300) per box

(the "Product") which my client is setting aside from a 2 billion box lot that has been proof[ed] up."

85.    Defendants Weber, Allen, and BCCD knew the representations in the June 3, 2021 letter were false and/or the false representations were made with reckless disregard for the truth.  It is further alleged that these statements were made for purpose of inducing Plaintiff to deposit $1,000,000.00 into Defendant Weber's attorney trust account.

86.    Defendants Allen, Weber, and BCCD made false representations of material fact when they signed the June 6, 2021 contract, which is attached as Exhibit 1 and represented that BCCD "is prepared to sell your company, The J. Noble Group, LLC, and its end-buyers, up to 200 million boxes of Cranberry Evolve gloves (300ct) ("Transaction")."

87.    Defendants Weber, Allen, and BCCD knew the representations in the June 6, 2021 letter were false and/or the false representations were made with reckless disregard for the truth.  It is further alleged that these statements were made for purpose of inducing Plaintiff to deposit $1,000,000.00 into Defendant Weber's attorney trust account.

88.    Defendant Weber made false representations of material fact when he issued a letter dated July 3, 2021, sworn under the penalties of perjury and attached as Exhibit 4, which asserted that BCCD "is ready, willing and able to transact" because BCCD "secured a large lot of Cranberry Evolve nitrile gloves that is being broken up to supply various purchasers from [Plaintiff]."  Defendant Weber further falsely stated that "my client, BCCD, has entered two … warehouses and personally, physically inspected within the last two weeks the product which is warehoused on a six tier racking system (approximately 240 million boxes) and that a verifiable SGS report for the master lot which references these warehouses is in hand."

89.    Defendants Weber and Allen knew the representations in the July 3, 2021 letter, including the statements in the preceding paragraph, were false and/or the false representations were made with reckless disregard for the truth.  It is further alleged that these statements were made for purpose of delaying Plaintiff from seeking the return of the $1,000,000.00 and obscure the fact that Defendant Weber had already transferred Plaintiff's money from his attorney trust account.

90.    Defendant Weber made false representations of material fact when he issued a "Letter of Attestation as to Product" dated November 18, 2021, sworn under the penalties of perjury and attached as Exhibit 6, which asserted that "a lot consisting of at least 25 million (25,000,000) boxes . . . of Cranberry Evolve Gloves" were available for sale.  Defendant Weber asserted that "my client [referring to Defendant Allen] has inspected said Product in 3 warehouses in the California area within the last 3 weeks."

91.    Defendants Weber and Allen knew the representations in the November 18, 2021 letter, including the statements in the preceding paragraph, were false and/or the false representations were made with reckless disregard for the truth.  It is further alleged that these statements were made for purpose of delaying Plaintiff from seeking the return of the $1,000,000.00 and obscure the fact that Defendant Weber had already transferred Plaintiff's money from his attorney trust account.

92.    Defendants made these false representations for purposes of defrauding Plaintiff in order to obtain one million dollars from Plaintiff, which was deposited into Defendant Weber's attorney trust account.

93.    Plaintiff justifiably relied on these representations since this deal relied on representations by Defendant Allen and Defendant Weber, a licensed Florida attorney, and the

transaction was predicated on Defendant Weber safeguarding Plaintiff's money in his attorney trust account.

94.    Plaintiff suffered damages as a result of its justifiable reliance on these misrepresentations because Defendants Weber, Allen, and BCCD received one million dollars, retained it based on false promises, and refused to return this money to Plaintiff.  Additionally, Plaintiff has suffered lost profits and consequential damages as a result of Defendants' intentional misrepresentations.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (A) Awarding Plaintiff compensatory damages against Defendants in the amount of $1,000,000.00 plus consequential damages and lost profits in an amount to be determined at trial but no less than $50,000.000.00; (B) Awarding punitive damages in an amount to be determined at trial; (C) Awarding Plaintiff its costs and expenses in this litigation; and (D) Awarding such other relief as the Court deems just and proper.

**COUNT VI**
**(Civil Conspiracy)**
**(Against All Defendants)**

95.    Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

96.    Defendant Allen, Defendant Weber, and BCCD entered into an agreement and/or understanding to obtain money from Plaintiff by falsely claiming that Defendant Allen personally or through a company could obtain access to large quantities of medical gloves to sell to Plaintiff.  These claims were false.

97.    The agreement and/or understanding further provided that Defendant Weber would use his status as a licensed attorney and his access to an attorney trust account to provide a

false sense of trust and safety to Plaintiff along with promises that the funds would remain safely in escrow pending completion of the sale of goods.

98.    Defendants engaged in unlawful and/or tortious acts and/or used unlawful or tortious means to accomplish and further the conspiracy. Specifically, based on these false representations coupled with the involvement of a licensed Florida attorney, Plaintiff transferred one million dollars in June 2021 to Defendant Weber's attorney trust account. The same day that he received the funds, instead of safe keeping the funds in escrow, he transferred $895,000.00 to a bank account controlled by Defendant Weber and kept the remaining funds for himself.

99.    Plaintiff suffered damages as a result, including the loss of one million dollars, compensatory damages, and lost profits.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (A) Awarding Plaintiff compensatory damages against Defendants in the amount of $1,000,000.00 plus consequential damages and lost profits in an amount to be determined at trial but no less than $50,000.000.00; (B) Awarding punitive damages in an amount to be determined at trial; (C) Awarding Plaintiff its costs and expenses in this litigation; and (D) Awarding such other relief as the Court deems just and proper.

**COUNT VII**
**Unjust Enrichment**
**(Against Defendants Allen and Weber)**

100.    Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

101.    Plaintiff conveyed a benefit on Defendant Allen and Weber when it transferred one million dollars to Defendant Weber's attorney trust account.  Defendant Weber then split

these funds when he transferred $895,000.00 to an account controlled by Defendant Allen and kept approximately $105,000.00 for himself.

102.   It is further believed and alleged that Defendant Allen either has spent this money or used this money for other business dealings.

103.   Defendants Allen and Weber had an appreciation and knowledge that they received a benefit from Plaintiff given that both defendants were expecting the funds to be transferred and to be held in escrow pending completion of the sale of medical gloves, which never occurred.

104.   Defendants Allen and Weber have accepted and retained the money under such circumstances that make it inequitable for them to retain the benefit of this money. It must be returned immediately.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, as follows: (A) Awarding Plaintiff damages against Defendants in an amount to be determined at trial, but, no less than $1,000,000.00; (C) Awarding Plaintiff its costs and expenses in this litigation; and (D) Awarding such other relief as the Court deems just and proper.

## COUNT VIII
### Breach of Personal Guarantee
### (Against Defendant Allen)

105.  Plaintiff hereby adopts and incorporates by reference the allegations contained in all of the paragraphs of this Complaint as though set forth fully herein.

106.   Defendant Allen personally guaranteed the repayment of the $1,000,000.00, and he breached this personal guarantee by failing to repay this money, and he is personally liable based on this breach.

107.    In response to demands for repayment, Defendant Weber sent an email on Friday May, 13, 2022, copying Defendant Allen, to Mr. Brammer and others advising that "Reggie Allen states that he takes full responsibility for the $1 million" and he sought to induce Plaintiff to refrain from taking action until "early next week so that you are paid back plus more."

108.    Based on these representations, Defendant Allen agreed to personally guarantee the one million dollars so long as Defendant Allen had until May 18, 2022 to repay the money.

109.    Defendant Weber sent this email with the authority and approval of Defendant Allen and within the scope of his agency relationship with Mr. Allen.  Defendant Weber's statement was truthful that Defendant Allen "takes full responsibility for the $1 million."

110.    This writing constituted a personal guarantee by Defendant Allen of Plaintiff's one million dollars. The email states as follows:

Gentlemen,

Reggie and I ask that you stand by and permit the following to unfold today and early next week so that you are paid back plus more.

After I type this email, I am taking the actions sent in a separate email to you.

**Reggie Allen states that he takes full responsibility for the $1 million.**

These are the transactions and their sequences with BCCD:
1. CT gloves – approximately 500,000 boxes.
a. Initial payment funded by private group causing chain of custody and bill of sale to be provided by seller to endbuyer.
b. After Buyer review of COC/BOS, Weber escrow funded $17.5 million.
c. $500,000 to JNG, possibly today, but expect Monday.
d. BCCD to show copy of wire sent to Seller today.

2. Cranberry gloves – 1 to 10 million boxes.
a. Reggie states that this is the source of gloves that is holding the JNG deposit. The attorney stated that if titleholder didn't perform, the full deposit is refunded/credited. If titleholder not given opportunity to perform, 70% of deposit

is kept. Because the total deposits exceed $5 million, there will be a full $1 million for JNG if the latter occurs.
b. Today is the inspection of the lot. BCCD's buyer is inspecting, and will wire the funds after inspection.
c. JNG to receive $1.0 million by Monday or Tuesday.

3. iHealth – ~40 million (no longer ~22 million) + additional 60 million.
a. BCCD is now working directly with the entity working with the government; in last 30 minutes, we were notified that the contract was extended/renewed.
b. Inspection is the chain of custody documents, then wire executed 'immediately' we are told.
c. Expect distribution by Monday, but may be Tuesday.
d. In any event, we will see progress that can be disseminated to JNG.

Thank you.

111.  Because Defendant Allen and Weber had until May 18, 2022 to attempt to repay this money but failed to do so, Plaintiff seeks to enforce Defendant Allen's personal guarantee to repay the one million dollars retained by Defendants.

WHEREFORE, Plaintiff requests that the Court enter a judgment against Defendant Allen as follows: (A) Awarding Plaintiff monetary damages against Defendants in the amount of $1,000,000.00; (B) Awarding Plaintiffs their costs and expenses in this litigation; and (C) Awarding such other relief as the Court deems just and proper.

Respectfully Submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By:        /s/

Matthew M. Bryant (#18014)
mbryant@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
T: (240) 553-1185
F: (240) 553-1784
*Counsel for Plaintiff*